**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JESSICA CONNER,<br><br>                    Plaintiff,<br><br>    v.<br><br>STARK & STARK, P.C.,<br><br>                    Defendant. | Civil Action No. 23-20940 (GC) (JTQ)<br><br>**OPINION** |

**CASTNER, District Judge**

  **THIS MATTER** comes before the Court upon Defendant Stark & Stark, P.C.'s Motion for

Summary Judgment pursuant to Federal Rule of Civil Procedure (Rule) 56. (ECF No. 37.)

Plaintiff Jessica Conner opposed, and Defendant replied. (ECF Nos. 38, 41.) The Court has

carefully reviewed the parties' submissions and held oral argument on June 3, 2025. For the

reasons set forth below, and other good cause shown, Defendant's Motion is **GRANTED in part**

and **DENIED in part**.

**I.    BACKGROUND**

  **A.    Factual Background[1]**

  Defendant is a law firm with its principal place of business in Hamilton, New Jersey.

(SUMF ¶¶ 1-2.) Defendant employs over 200 people across several offices. (*Id.* ¶ 3.) In January

---

[1]  On a motion for summary judgment, the Court "draw[s] all reasonable inferences from the underlying facts in the light most favorable to the nonmoving party." *Jaffal v. Dir. Newark N.J. Field Off. Immigr. & Customs Enf't*, 23 F.4th 275, 281 (3d Cir. 2022) (quoting *Bryan v. United States*, 913 F.3d 356, 361 n.10 (3d Cir. 2019)). The factual circumstances surrounding this action, as revealed through discovery, are set forth in the parties' submissions in accordance with Local Civil Rule 56.1. Defendant's Statement of Undisputed Material Facts (SUMF) is at ECF No. 37-2, Plaintiff's Responsive Statement of Material Facts (RSMF) is at ECF No. 38-2 and Plaintiff's

2018, Plaintiff was hired by Defendant to serve as Accounts Payable/Accounts Receivable Manager (AP/AR Manager) in Defendant's Finance Department. (*Id.* ¶ 4.) Plaintiff's offer of employment letter expressly states that she would be an "at will" employee. (*Id.* ¶ 5.)

Plaintiff's duties as AP/AR Manager included supervising "general ledger management, cash activity, bank reconciliations, and other key financial functions." (*Id.* ¶ 7; RSMF ¶ 7.) Plaintiff reported directly to Stephen Townsend, the Director of Finance, during the relevant timeframe (*i.e.*, the last several years of Plaintiff's employment with Defendant). (SUMF ¶ 6.) While Plaintiff admits that she "supervised the workload and functions of the Finance Department team," Plaintiff maintains that "Townsend truly retained most supervisory authority over the team." (*Id.* ¶ 8; RSMF ¶ 8.)

In April 2022, Plaintiff had shoulder surgery to address issues with her rotator cuff. (SUMF ¶ 38.) Plaintiff did not consider taking medical leave at that time, nor did she raise the possibility of taking leave with Defendant's human resources department. (*Id.* ¶ 39.) Plaintiff resumed working full-time almost immediately after the surgery. (*Id.* ¶ 40.)

On March 31, 2023, Plaintiff sent an email to the Finance Department stating that she was scheduled to have a second shoulder surgery on April 24, 2023. Plaintiff wrote that she intended to take some time off during that week but would be "partially working," and that her hope was to return to working full-time the following week. (*Id.* ¶¶ 42-43; RSMF ¶ 43.)

In early 2023, Defendant started preparing for a major move of one of its offices from Lawrenceville, New Jersey to Hamilton, New Jersey. (SUMF ¶ 41.) The move was scheduled for April 17-21 (*i.e.*, the week before Plaintiff's second shoulder surgery). (*Id.*) On April 12, 2023,

---

Counterstatement of Material and Disputed Facts (CSMF) is at ECF No. 38-1. Unless otherwise noted, the relevant facts are undisputed or supported by record evidence.

Townsend emailed the Finance Department to outline the plans for the move. Townsend also requested that the team be in the office the week prior to the move, unless there was a need to work from home. Townsend's email stated as follows:

> Next week. All hands on Deck for the entire week. That is not to say that if you need to [work from home] and your area is set up and ready to go that you can't do so. (For instance I have an appointment with Social Services again next Wednesday that I cannot miss). I would ask however that you plan to be there all week and then play it by ear.

> [(ECF No. 37-4 at 137.[2])]

Defendant asserts that Plaintiff "was not present in the new offices for the entire week," to which Plaintiff responds that she was present in the office for three days that week, and that she set up her own area and helped others do the same. (SUMF ¶ 50; RSMF ¶ 50.)

On April 24, 2023, Plaintiff had her second surgery as planned. (SUMF ¶ 51.) Following Plaintiff's shoulder surgery, Plaintiff worked from home while she wore a shoulder sling and was not permitted to drive. (*See id.* ¶¶ 53-54; RMSF ¶ 53.) While Defendant contends that "neither Townsend nor anyone else at the Firm objected to" Plaintiff working from home, Plaintiff claims that Townsend showed animosity towards her. (SUMF ¶ 53; RSMF ¶ 53.) Plaintiff testified at her deposition that following her second shoulder surgery, Townsend made a comment that it would have been nice if the issue had been fixed the first time. (RSMF ¶ 53; ECF No. 38-3 at 33.) Townsend denies that he made such a comment. (ECF No. 38-5 at 13.)

On May 23, 2023—before Plaintiff received approval from her physician to return to the office—Townsend sent Plaintiff the following email:

> First, how is your shoulder?

---

[2]     Page numbers for record cites (*i.e.*, "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

> Do you have clearance to return to work?  If not HR has informed me you must contact them about going on FMLA – which should have happened the day of the surgery.
>
> When will we see you again?  I need you to be in the office on a more regular basis, as we have discussed we have a three-day a week policy and I haven't seen you since we moved.
>
> [(CSMF ¶ 33.)]

Plaintiff responded that same day, expressing confusion regarding the need for her to take leave, writing back in relevant part:

> So I guess I'm confused on why now the concern regarding return to work or taking leave now?  With the exception of the first week after surgery of limited hours, I have been working.  I have only been in the office 2 days since I am unable to drive but have come in when coverage was needed.
>
> Since I let you know of my surgery in March, there was no mention of leave so I just assumed it was ok to continue to work.
>
> . . . .
>
> At this point as it's a month after surgery, I'd prefer to continue to work but if I need to contact HR for leave then I will do so.
>
> Just let me know.
>
> [(CSMF ¶¶ 35-36.)]

In Plaintiff's deposition, Plaintiff testified that she never sought to take leave, nor did she think it was necessary:

> [DEFENSE COUNSEL]: That wasn't my question.  My question was did you talk with Mr. Townsend after you sent this March 31st email about the possibility of taking family medical leave?  Whether you were thinking about it, did you talk with him about that subject at all?
>
> [PLAINTIFF]: I did not.
>
> [DEFENSE COUNSEL]: Okay.  Were you thinking about it?
>
> [PLAINTIFF]: I didn't think there was a need for it.  I was working.

4

[DEFENSE COUNSEL]: Okay.  Including fairly soon, right after the surgery, you were continuing to work?

[PLAINTIFF]: The following week, yeah.

[DEFENSE COUNSEL]: Okay.  So did you approach anyone in the human resources department to talk about taking any kind of a medical leave after this surgery?

[PLAINTIFF]: No.

[DEFENSE COUNSEL]: Okay.  And that never changed at any point in time; right?  You didn't change your mind to say, hey, I really ought to take a leave; I'm going to think about taking a leave? You never changed your mind?

[PLAINTIFF]: No.

[(ECF No. 37-4 at 14.)]

In response to Townsend's May 23 email urging Plaintiff to be more present in the office, Plaintiff also wrote that she intended to work from the office when she was able to drive, but she expressed uncertainty regarding the specifics of Defendant's hybrid work from home policy. (CSMF ¶ 36.)  According to Defendant's written policies, advance approval is required before an employee is permitted to work from home.  (SUMF ¶¶ 24, 29.)  Plaintiff does not dispute that Defendant's written policy requires employees to seek pre-approval before working from home, but Plaintiff disputes that this requirement applied to her.  (RSMF ¶ 29.)  Plaintiff submits that, in practice, the requirement to make a formal request to work from home did not apply to her as a supervisor.  (CSMF ¶ 60.)

Townsend did not reply to Plaintiff's May 23 email, wherein Plaintiff expressed confusion about the need to take leave and about Defendant's hybrid work from home policy.  (CSMF ¶ 37.) Plaintiff sent a follow-up email on June 2, stating "[n]ot sure where I stand with the leave question but just returned from the doctor and no more sling during the day and can now go back to driving. With that said I will be able to get back in the office more often."  (ECF No. 37-4 at 140.)

Defendant contends that Plaintiff was absent from the office on June 26, 2023, which caused Plaintiff to miss a directive from Defendant's managing shareholder requesting that a $1.9 million wire transfer be initiated.  (SUMF ¶¶ 57-58.)  The wire transfer was not completed as requested.  (SUMF ¶ 58; RSMF ¶ 58.)  Plaintiff, however, disputes that the missed wire payment was her responsibility, as she instead claims that Stephen Slivka, another member of the finance team who reported to Plaintiff and Townsend, was primarily responsible for handling wire transfers, with Plaintiff only serving as a backup.  (CSMF ¶¶ 71-72; RSMF ¶ 10.)  Plaintiff testified that Slivka never informed her that he would be unavailable that day, and therefore Plaintiff did not know that she had to cover for him.  Slivka, however, testified in his deposition that he emailed Plaintiff to notify her that he would be leaving work early.  (ECF No. 38-7 at 7.)

Townsend testified that Plaintiff's termination was first considered on June 26 or 27, 2023. (CSMF ¶ 50; ECF No. 38-5 at 17.)  Townsend also testified that there were discussions about putting Plaintiff on a performance improvement plan as early as April 2023.  (ECF No. 37-4 at 30-31.)  A human resources representative testified that "earlier in June" the logistics and process for terminating Plaintiff were discussed.  (CSMF ¶ 49.)  The record, however, reflects that on May 23, 2023—the same day that Townsend emailed Plaintiff regarding the need for her to be present in the office more often—Defendant and its outside counsel discussed potentially terminating Plaintiff.  (CSMF ¶ 51; ECF No. 38-16 at 2.)

During the course of her employment with Defendant, Plaintiff received several performance reviews.  In her most recent review in either April or May of 2022, Plaintiff received an annual performance review with an overall rating of "meets expectations," with a 3.09 on a 5-

point scale.[3] (ECF No. 38-12.)  Townsend made several references to issues with Plaintiff's work from home schedule and availability in the review.  For example, Townsend wrote that he was "concerned (but not yet convinced) that [Plaintiff] used Work From Home to address personal issues in a way that she would not or could not from the office."  (*Id.* at 54-55.)  Townsend also wrote that Plaintiff should be more "available" when working from home.  (*Id.* at 52.)  Townsend concluded Plaintiff's review by writing that Plaintiff "continues to be a strong member of the Finance Team.  We will need to work to make sure that [work from home] options do not create optical issues with [Plaintiff's] work levels."  (*Id.* at 62.)  Before that review, Plaintiff's most recent review was in 2020,[4] where Townsend gave Plaintiff an overall rating of "meets expectations," with an overall score of 3.35 out of 5.  (*Id.* at 23.)  In 2019, Plaintiff received an overall rating of "above expectations," with a 3.78 out of 5.  (*Id.* at 3.)

On June 30, 2023, just days after the missed $1.9 million wire transfer, Defendant terminated Plaintiff's employment.  (SUMF ¶ 62.)  Defendant proffers four reasons for Plaintiff's termination: (1) Plaintiff was absent for most of the week of Defendant's office move; (2) Plaintiff continued to be frequently absent from the office even when she was cleared to return to work; (3) Plaintiff's absence from the office on June 26, 2023 led her to miss an email directing the finance team to initiate a wire transfer; and (4) Plaintiff's overall conduct "convinced Townsend and the Firm that she was not capably and adequately performing in her job, which required supervision

---

[3]    Defendant's performance evaluation includes a 5-point scale: "unsatisfactory," "needs improvement," "meets expectations," "above expectations," and "outstanding."  (ECF No. 38-12 at 24.)

[4]    Townsend did not complete a review of Plaintiff in 2021, but Plaintiff completed a self-evaluation in which she rated herself as "above expectations," with a 3.76 out of 5.  (ECF No. 38-12 at 37.)

of a staff of people in the Finance Department." (SUMF ¶ 63.) Plaintiff was replaced by a non-disabled individual. (CSMF ¶ 55.)

### B. Procedural Background

On August 25, 2023, Plaintiff filed her Complaint against Defendant in the Superior Court of New Jersey, Law Division, Mercer County. (ECF No. 1-1.) Defendant thereafter removed the matter to this Court based on the Court's federal question jurisdiction under 28 U.S.C. § 1331. (ECF No. 1.) Plaintiff's two-count Complaint alleges violations of the New Jersey Law Against Discrimination, N.J. Stat. Ann. § 10:5-1 *et seq.* (NJLAD) (Count One) and the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* (FMLA) (Count Two).[5]

## II. <u>LEGAL STANDARD</u>

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A dispute is "genuine" if it could lead a "reasonable jury [to] return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* When deciding the existence of a genuine dispute of material fact, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. The Court must grant summary judgment if any party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Roofer's Pension Fund v. Papa*, 687 F. Supp. 3d 604,

---

[5]    The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1367.

616 (D.N.J. 2023) ("In the face of a properly supported summary judgment motion, the nonmovant's burden is rigorous: the party 'must point to concrete evidence in the record'—mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment." (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 484 (3d Cir. 1995))).  "[I]nferences, doubts, and issues of credibility should be resolved against the moving party." *Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 307 n.2 (3d Cir. 1983).

III.    **DISCUSSION**

 A. **NJLAD—Discrimination and Retaliation**[6]

 Plaintiff brings a NJLAD claim based on two theories: disability discrimination and retaliation.  To prove disability discrimination under the NJLAD, a plaintiff must establish that "(1) she was disabled within the meaning of the statute; (2) she was qualified to perform the essential functions of the position of employment; and (3) she suffered an adverse employment action because of the disability." *Fitzgerald v. Shore Mem'l Hosp.*, 92 F. Supp. 3d 214, 235-36 (D.N.J. 2015).  And "[t]o establish a prima facie claim for retaliation under NJLAD, a plaintiff must demonstrate that [s]he 'engaged in a protected activity that was known to the employer, that [she] was subjected to an adverse employment decision, and that there is a causal link between the activity and the adverse action.'" *Zulauf v. Stockton Univ.*, Civ. No. 15-3526, 2017 WL 700111, at *9 (D.N.J. Feb. 22, 2017) (quoting *LaPaz v. Barnabas Health Sys.*, 634 F. App'x 367, 369 (3d Cir. 2015)).

---

[6] Because Plaintiff's NJLAD discrimination and retaliation theories are closely related and generally rely on the same underlying facts and legal arguments, the Court analyzes them together.

Plaintiff's NJLAD[7] claim is governed by the three-step burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Zive v. Stanley Roberts, Inc.*, 867 A.2d 1133, 1139 (2005); *Tourtellotte v. Lilly & Co.*, 636 F. App'x 831, 841 (3d Cir. 2016) ("All retaliation and discrimination claims brought under . . . the NJLAD, including those based on . . . disability, which rely on circumstantial evidence, are controlled by the three-step burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green.* . . ."). Under the *McDonnell Douglas* framework, a plaintiff first bears the burden to establish a prima facie case of discrimination or retaliation. *See* 411 U.S. at 802. Second, if a plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate non-retaliatory or non-discriminatory reason for the adverse employment action. *Clowes v. Terminix Int'l, Inc.*, 538 A.2d 794, 805 (N.J. 1988). Third, the plaintiff bears the final burden to demonstrate that the defendant's proffered reason is a mere pretext through evidence that the provided rationale is false or that the real reason for the adverse action was discriminatory or retaliatory animus. *Zive*, 867 A.2d at 1140; *see Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006) (requiring plaintiff to "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action" (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994))).

Demonstrating pretext "requires more than a mere possibility that a trier of fact might disbelieve an employer's explanation for its employment decision; it requires that the plaintiff offer some evidence that would support the trier of fact's disbelief." *Grisso-Leahey v. Centers Health*

---

[7]    "[I]n interpreting the NJLAD in disability discrimination claims, 'federal law has consistently been considered for guidance.'" *Pikowski v. GameStop, Inc.*, Civ. No. 11-2732, 2013 WL 6498072, at *6 (D.N.J. Dec. 11, 2013).

*Care*, Civ. No. 21-04433, 2022 WL 18425527, at *4 (D.N.J. Dec. 30, 2022) (quoting *Cullen v. Select Med. Corp.*, 779 F. App'x 929, 932 (3d Cir. 2019)).  More particularly, a plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons." *Fuentes*, 32 F.3d at 765 (citing *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 531 (3d Cir. 1992); *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 638 (3d Cir. 1993)).

Here, Defendant has conceded for purposes of this Motion that Plaintiff has set forth a prima facie case under the NJLAD.  (ECF No. 37-1 at 12.)  Under the second step of the *McDonnell Douglas* analysis, Defendant has proffered several legitimate nondiscriminatory reasons for terminating Plaintiff, all of which relate to Plaintiff being absent from the office.  (*Id.* at 12-13.)  For instance, Defendant submits that before Plaintiff had her second shoulder surgery, Plaintiff defied Townsend's instruction to work from the office during the week leading up to Defendant's office move in April.  (*Id.* at 13.)  Defendant also asserts that following Plaintiff being cleared to return to work in early June, she was absent "many days" from the office.  (*Id.*)  As a result of Plaintiff's absence, Defendant claims that Plaintiff missed an important directive about a $1.9 million wire transfer, which was not sent.  (*Id.*)  Defendant also highlights that Plaintiff's absences were raised in Plaintiff's performance review around a year prior to Plaintiff's second shoulder surgery.  (*Id.* at 12.)  Plaintiff does not appear to dispute that Defendant has proffered legitimate nondiscriminatory reasons for her termination.  (ECF No. 38 at 23 ("As Defendant concedes that Ms. Conner is able to establish her prima facie cases, she will solely address its argument that she is unable to establish pretext in Defendant's reasons for terminating her.").)  *See also Fuentes*, 32

F.3d at 763 ("The employer need not prove that the tendered reason actually motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff.").

Turning to the final step of the burden shifting analysis, Plaintiff contends there is sufficient evidence in the record demonstrating that Defendant's reasons for terminating her were pretextual. (ECF No. 38 at 22.)  Plaintiff argues that she had a "lengthy history of satisfactory performance and complete lack of reprimands or disciplinary action," and insists that she was fired "abruptly" only immediately after requesting and using accommodations for her shoulder surgery.  (*Id.* at 23-24.)  Plaintiff contends that her supervisor Townsend showed animosity towards her after she announced that she was having a second shoulder surgery.  (*Id.* at 27.)  Plaintiff also claims that it is "highly suggestive" that she was terminated, at most, just over two months after her shoulder surgery and just two weeks after using time off to attend a physical therapy appointment.  (*Id.* at 31.)  Finally, Plaintiff asserts that she was replaced by a non-disabled individual, that Defendant's witnesses are not credible and that Defendant has a history of retaliation.  (*Id.* at 36-37.)

Defendant counters that Plaintiff was fired for insubordination, more specifically that Plaintiff refused to work from the office more frequently.  (ECF No. 41 at 10.)  According to Defendant, Plaintiff's absence from the office on June 26, 2023—after Plaintiff had been cleared by her doctor to return to work—led to Plaintiff missing an important directive from the Defendant's managing shareholder to initiate a $1.9 million wire transfer for a client.  (ECF No. 37-1 at 9.)  This alone, according to Defendant, was enough of a reason to fire Plaintiff, as Defendant argues it "was not required by any law to ignore [Plaintiff's] insubordination at the end of June 2023 simply because she underwent a shoulder surgery two months earlier and missed a few days of work."  (ECF No. 41 at 10-11.)  Defendant further argues that Plaintiff was absent

from the office before her surgery, even though Townsend directed the Finance Department to work from the office to assist with the office move.  (ECF No. 37-1 at 8.)

Based on the record, the Court finds that Plaintiff has pointed to evidence upon which a reasonable jury could conclude that she was fired based on her disability to survive summary judgment.  For instance, a reasonable jury could find that Defendant made the decision to terminate Plaintiff before the $1.9 million wire transfer incident on June 26, 2023, and before Plaintiff was cleared to return to the office on June 5, 2023.  Indeed, Defendant's privilege log in this matter suggests Plaintiff's termination was being discussed as early as May 23, 2023, and a human resources representative testified that "earlier in June" there was a direction to work out the logistics and process for terminating Plaintiff.  (ECF No. 38 at 29; ECF No. 38-16 at 2; CSMF ¶ 49.)  The timing of Defendant's communication with outside counsel on May 23 is also significant in that it occurred on the same day that Townsend e-mailed Plaintiff asking whether she was cleared to return to work, advising her about medical leave and the need to be in the office more regularly.  (ECF No. 37-4 at 142.)  Based on this timeline, a reasonable jury could conclude that discriminatory intent motivated Defendant's decision to terminate Plaintiff.  *See Rogers v. Waukegan Pub. Sch. Dist. 60*, 924 F. Supp. 2d 940, 951 (N.D. Ill. 2013) ("Evidence that a decisionmaker had decided to fire a plaintiff before the asserted reason for firing h[er] . . . arose can support an inference that the reason is pretextual.").

Further, when viewed in the light most favorable to Plaintiff, Townsend's comment to Plaintiff that it would have been nice if the issue with her shoulder had been resolved the first time, combined with the fact that Townsend did not respond to Plaintiff's email notifying the Finance Department that she would need to have shoulder surgery, at a minimum, creates a genuine issue of material fact as to Plaintiff's theory that Townsend harbored animosity towards her disability.

13

*See Parson v. Vanguard Grp.*, Civ. No. 15-3942, 2016 WL 3878165, at *6 (E.D. Pa. July 18, 2016), *aff'd*, 702 F. App'x 63 (3d Cir. 2017) ("Stray remarks, in combination with evidence to discredit an employer's legitimate non-discriminatory reason, may support a showing of pretext."); *Petrosky v. New York State Dep't of Motor Vehicles*, 72 F. Supp. 2d 39, 60 (N.D.N.Y. 1999) ("Negative comments directed at a person's disability can, when combined with other evidence, support an inference that the adverse employment action was taken on the basis of the employee's disability."); *see also Williams*, 124 F. App'x at 101 ("[A]n employer's refusal to properly support an employee can be tantamount to setting the employee up to fail, and thus may support an inference of discriminatory animus."). And while Defendant argues that Plaintiff was aware that her attendance issues were raising a concern, Plaintiff was not placed on a performance improvement plan or formally reprimanded. (CSMF ¶ 8.) As noted by Plaintiff, Defendant's policies outline formal performance improvement processes which were not used in Plaintiff's case. (ECF No. 38 at 25; CSMF ¶ 9.) Regardless, in the performance review where Townsend suggested that Plaintiff's remote work habits were becoming problematic, Townsend concluded that Plaintiff "continues to be a strong member of the Finance Team." (ECF No. 37-4 at 124-25.) The Court finds that a reasonable jury may find this casts doubt on Defendant's proffered reasons for terminating Plaintiff.

Finally, Plaintiff has raised a credibility issue, particularly as to Townsend, that is more appropriate for a jury to decide. For example, Townsend testified that Plaintiff's termination was not discussed until June 26 or 27, 2023, (ECF No. 38-5 at 17), which appears inconsistent with Defendant's own privilege log and the May 23, 2023 communications. (ECF No. 38-16 at 2.) And Defendant's privilege log shows that Townsend himself received an e-mail from Defendant's counsel with the subject line "Information Needed for Evaluation of Options for Employment

Termination" on June 19, 2023. (*Id.*) Defendant does not address Plaintiff's argument about Townsend's credibility in its reply brief, but the Court notes that Townsend's credibility may be significant because of his central role in the underlying events. *See Ratzenbek v. Okna Windows Corp.*, Civ. No. 17-04525, 2019 WL 13292838, at *1 (E.D. Pa. July 12, 2019) ("[A] defendant's credibility problems can be the basis of a jury's inference of pretext, allowing the jury 'to conclude that the employer was actually motivate[d] by illegal bias[.]'" (quoting *Bray v. Marriott Hotels*, 110 F.3d 986, 990 (3d Cir. 1997))). Indeed, Townsend wrote the performance review that Defendant relies on for support in terminating Plaintiff. (ECF No. 37-4 at 124-25.) Moreover, a human resources representative testified at her deposition that it was Townsend who wanted to terminate Plaintiff because Townsend "wanted a manager for his team." (ECF No. 38-11 at 19, 67:23-68:4.)

For these reasons, the Court concludes that Plaintiff has raised a factual dispute with respect to pretext.[8] Accordingly, Defendant's Motion for Summary Judgment as to Plaintiff's NJLAD claim (Count One) is denied.

---

[8] Plaintiff also argues that Defendant's termination of another employee, Kimberly Graper, for "complaining about unethical and illegal activity occurring within the finance department" is also suggestive of pretext. (ECF No. 38 at 37.) "[A]n employer's treatment of other employees can show a culture of retaliation." *Smith v. Univ. of Scranton*, 770 F. App'x 23, 26 (3d Cir. 2019). But Plaintiff does not explain how Graper's termination for reporting "unethical and illegal activity" is relevant to Plaintiff's disability discrimination claim, or how the situation raised by Defendant shows there was a "culture" of retaliation. *See Ford v. Marion Cnty. Sheriff's Off.*, 942 F.3d 839, 858 (7th Cir. 2019) (noting that "[a]n employer's general policy and practice . . . can be relevant evidence of pretext or discrimination" with respect to disability discrimination but holding that "such evidence must undercut the specific justifications given by the employer.") (internal citations omitted); *Stinson v. Cnty. of Cook*, Civ. No. 18-1614, 2020 WL 6870816, at *15 (N.D. Ill. Nov. 23, 2020) ("[E]ven assuming that the statements of three employees are sufficient to establish . . . a culture of retaliation, [the p]laintiff has not connected her argument that there was a general culture of retaliation to the specific reasons [given] for suspending [the p]laintiff.").

### B.    FMLA

"The FMLA provides, in relevant part, that eligible employees are entitled to 12 workweeks of leave during any 12–month period due to an employee's own serious health condition." *Ross v. Gilhuly*, 755 F.3d 185, 191 (3d Cir. 2014.)  "There are two distinct claims arising under the FMLA: retaliation and interference." *Johnson-Braswell v. Cape Henlopen Sch. Dist.*, Civ. No. 14-1089, 2015 WL 5724365, at *4 (D. Del. Sept. 29, 2015) (citing *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 301 (3d Cir. 2012).  Plaintiff argues that she succeeds under both theories. The Court addresses each in turn.

### 1.    *Interference*

The FMLA "prohibits an employer from 'interfer[ing] with, restrain[ing], or deny[ing] the exercise of or the attempt to exercise, any right' that it guarantees." *Marsh v. GGB, LLC*, 455 F. Supp. 3d 113, 121 (D.N.J. 2020)  (alterations in original).  To prevail on an interference claim, a plaintiff must show that: (1) "[she] was an eligible employee under the FMLA"; (2) "the defendant was an employer subject to the FMLA's requirements"; (3) "the plaintiff was entitled to FMLA leave"; (4) "the plaintiff gave notice to the defendant of [her] intention to take FMLA leave"; and (5) "the plaintiff was denied benefits to which [she] was entitled under the FMLA." *Chance v. St. Michael's Med. Ctr.*, Civ. No. 22-4526, 2023 WL 157585, at *2 (D.N.J. Jan. 11, 2023) (quoting *Ross*, 755 F.3d at 191-92).  Importantly, "[t]he FMLA . . . does not provide employees with a right against termination for a reason other than interference with rights under the FMLA." *Lichtenstein*, 691 F.3d at 312 (internal quotation marks and citation omitted).  As such, where a defendant can show that a plaintiff was terminated for a reason other than interference with the plaintiff's FMLA rights, the plaintiff's interference claim fails.  *Id.* (collecting cases).

Defendant argues that Plaintiff's FMLA interference claim fails because Plaintiff never sought or intended to take FMLA leave to recuperate from her shoulder surgery.  (*See* ECF No.

37-1 at 16.)  Defendant relies on Plaintiff's own deposition testimony, in which Plaintiff testified that she never asked Defendant's human resources department to take medical leave following her surgery.  (*Id.*)  In response, Plaintiff argues that Defendant was on notice of Plaintiff's need for FMLA medical leave.  (*See* ECF No. 38 at 10.)  Plaintiff asserts that her failure to comply with Defendant's internal policies for requesting leave does not foreclose her FMLA claim because she claims that "[e]mployers cannot deny FMLA leave on grounds that an employee failed to comply with internal procedures-as long as the employee gives timely verbal or other notice."  (*Id.* at 14 (quoting *Walton v. Ford Motor Co., Inc.*, 424 F3d 481, 486 (6th Cir. 2005)).)

Defendant argues in its reply brief that "no employee can be forced to take an FMLA leave when the employee does not want one" and further submits that Plaintiff "made a conscious choice not to go out on an unpaid leave, because she wanted to be paid her full salary for the few days she said she needed to recuperate from the shoulder surgery."  (ECF No. 41 at 14-15.)

Here, the record reflects that Plaintiff never intended to take medical leave under the FMLA following her shoulder surgery.  Plaintiff's deposition testimony on that point is clear:

> [DEFENSE COUNSEL]: So did you approach anyone in the human resources department to talk about taking any kind of a medical leave after this surgery?
>
> [PLAINTIFF]: No.
>
> [DEFENSE COUNSEL]: Okay. And that never changed at any point in time; right?  You didn't change your mind to say, hey, I really ought to take a leave; I'm going to think about taking a leave?  You never changed your mind?
>
> [PLAINTIFF]: No.
>
> [(ECF No. 37-4 at 14.)]

Plaintiff's emails with Townsend also show that Plaintiff did not intend to take FMLA leave.  In response to Townsend's email directing Plaintiff to contact human resources if she

17

needed to take FMLA leave, Plaintiff responded by writing "[s]ince I let you know of my surgery in March, there was no mention of leave so I just assumed it was ok to continue to work." (CSMF ¶ 36.) Plaintiff's failure to request leave also undercuts Plaintiffs' FMLA interference claim. *See Kelly v. Kinder Morgan, Inc.*, Civ. No. 23-1595, 2024 WL 3969683, at *9 (E.D. Pa. Aug. 28, 2024) (succeeding on an FMLA interference claim "requires the employee to have expressed an intention to take FMLA leave, following which the employer denied leave"); *Donnelly v. Cap. Vision Servs.*, LLC, 644 F. Supp. 3d 97, 109 (E.D. Pa. 2022) ("A terminated employee cannot claim FMLA interference for leave that they never requested.").

As to Plaintiff's argument that Defendant was on notice that Plaintiff's shoulder surgery entitled her to FMLA leave, it is true that "[a]n employee does not need to expressly assert rights under the FMLA or even mention the FMLA." *Hong Zhuang v. EMD Performance Materials Corp.*, Civ. No. 18-1432, 2018 WL 3814282, at *8 (D.N.J. Aug. 10, 2018). Further, "[w]hen an employee requests FMLA leave, or when the employer acquires knowledge that an employee's leave may be for an FMLA-qualifying reason, the employer must notify the employee of the employee's eligibility to take FMLA leave. . . ." 29 C.F.R. § 825.300(b)(1). "Courts have found interference of FMLA rights when an employer fails to advise an employee of his rights to a leave of absence after the employee has notified the employer of qualifying circumstances, and the failure to advise prejudices the employee." *Hall-Dingle v. Geodis Wilson USA, Inc.*, Civ. No. 15-1868, 2017 WL 899906, at *5 (D.N.J. Mar. 7, 2017).

Plaintiff dedicates a significant portion of her opposition brief to arguing that Defendant failed to provide her adequate notice of her rights under the FMLA. (*See* ECF No. 38 at 10-21.) However, "the failure to provide individualized notice is not alone sufficient to show interference, [a p]laintiff must also show that [s]he was prejudiced by the lack of notice." *Blake v. Alstom*

*Transportation Inc.*, Civ. No. 20-13603, 2022 WL 17250561, at *6 (D.N.J. Nov. 28, 2022). Plaintiff does not argue that she was prejudiced by Defendant's failure to provide her notice. As a result, to the extent that Plaintiff was entitled to FMLA leave and Defendant failed to inform her accordingly, the Court finds that Plaintiff's interference claim still fails. *See Matthews v. N.J. Inst. of Tech.*, 772 F. Supp. 2d 647, 658 (D.N.J. 2011) ("[A]ssuming [the p]laintiff was unaware of his FMLA rights . . . he has not met his burden of showing prejudice. There is no evidence that [the p]laintiff would have done anything differently had he been informed of his FMLA rights. . . ."); *In re Twp. of Parsippany-Troy Hills*, 17 A.3d 834, 841 (N.J. Super. Ct. App. Div. 2011) ("[T]he employee could not have shown prejudice because he specifically stated that he did not intend to take FMLA leave."). Here, the record clearly reflects that Plaintiff had no intention of taking FMLA leave.

Accordingly, Plaintiff cannot succeed on an interference theory, and summary judgment is granted in favor of Defendant on that basis.

### 2.    *Retaliation*

To prevail on an FMLA retaliation claim, an employee must show that: "(1) [she] invoked [her] right to FMLA-qualifying leave[;] (2) [she] suffered an adverse employment decision[;] and (3) the adverse action was causally related to [her] invocation of rights." *Chance*, 2023 WL 157585, at *3 (internal quotation marks and citation omitted). "Because FMLA retaliation claims require proof of the employer's retaliatory intent, courts have assessed these claims through the lens of employment discrimination law." *Lichtenstein*, 691 F.3d at 302. Accordingly, the Court applies the *McDonnell Douglas* burden shifting framework to assess Plaintiff's FMLA-retaliation claim. *Id.* (citing *McDonnell Douglas*, 411 U.S. at 802); *see also Canada v. Samuel Grossi & Sons, Inc.*, 49 F.4th 340, 346 n.36 (3d Cir. 2022) (confirming that *Lichtenstein* established that the

*McDonnell Douglas* framework is utilized to evaluate FMLA-retaliation claims in the Third Circuit).

Defendant argues that Plaintiff's FMLA retaliation claim fails because "[i]f an employee does not even seek to take a medical leave of absence, she cannot later contend that . . . her later termination of employment was in retaliation for the exercise of (or attempt to exercise) leave rights." (ECF No. 37-1 at 17.)  The Court agrees that Plaintiff's FMLA retaliation claim fails because Plaintiff cannot make out a prima facie claim.  In particular, Plaintiff cannot credibly claim that she was terminated in retaliation for requesting or taking FMLA leave when she neither requested nor took leave. Plaintiff's own testimony establishes that Plaintiff did not see a need to take leave to recover from her surgery, and the record is clear that Plaintiff never took FMLA leave.[9] (SUMF ¶ 47; RSMF ¶ 47.).  *See Dougherty v. Cable News Network*, 396 F. Supp. 3d 84, 110 (D.D.C. 2019) (collecting cases and noting that "[a] number of courts have found that employees are allowed to explicitly refuse to take leave they would otherwise be entitled to under the FMLA").  As a result, no reasonable jury could find that Plaintiff's termination was causally related to any exercise of Plaintiff's FMLA rights.  *See Carita v. Mon Cheri Bridals, LLC*, Civ. No. 10-2517, 2012 WL 2401985, at *5 (D.N.J. June 25, 2012) ("[N]o reasonable jury could find that [the p]laintiff requested FMLA leave on November 5, 2009.  As a result, [the p]laintiff is unable to present a prima facie case of an FMLA violation because there is no evidence of causation.").

Accordingly, the Court grants summary judgment in favor of Defendant on the entirety of Plaintiff's FMLA claim (Count Two).

---

[9]    At oral argument, Plaintiff's counsel seemed to imply that Plaintiff did take medical leave. Tr. of June 3, 2025 Oral Argument at 33.  The Court finds no support in the record for this assertion.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, and other good cause shown, Defendant's Motion for Summary Judgment (ECF No. 37) is **GRANTED in part** and **DENIED in part**. Plaintiff's NJLAD claim (Count One) may proceed, but Plaintiff's FMLA claim (Count Two) will be dismissed.  An appropriate Order follows.


Dated: June 17, 2025

GEORGETTE CASTNER
UNITED STATES DISTRICT JUDGE